NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0438n.06

Case No. 24-1080

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| HUSSAIN ALFATLAWY, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Oct 31, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| CITY OF DETROIT, MICHIGAN, | ) |  |
| Defendant, | ) |  |
| OFFICER JALYN CHARLES; OFFICER DARWIN SMITH | ) | O P I N I O N |
| Defendants-Appellants. | ) |  |

Before: MOORE, COLE, and LARSEN, Circuit Judges.

COLE, Circuit Judge. In the early morning hours, Detroit police officers Jalyn Charles and Darwin Smith arrested Hussain Alfatlawy on his porch, without an arrest warrant, based on information provided by a victim. Alfatlawy, who was released after the victim failed to identify him, sued Charles, Smith, and the City of Detroit, bringing unlawful arrest and excessive force claims under the Fourth Amendment via 42 U.S.C. § 1983, as well as tort claims under Michigan law. All defendants moved for summary judgment. The sole issue on appeal is the district court's denial of qualified immunity as to Alfatlawy's § 1983 unlawful arrest claim against Charles and Smith. Because the appeal rests on a factual dispute, we dismiss for lack of jurisdiction.

I.

In an interlocutory appeal of a denial of qualified immunity, we "ideally" look no further than the district court's opinion for the pertinent facts and inferences. *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). But when the record contains video that captures the relevant events, we may not adopt a version of the facts that is "'blatantly contradict[ed]'" by the footage "such that 'no reasonable jury could believe it.'" *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Here, we have four body camera videos. Accordingly, we draw the following facts from the district court opinion and the available footage. *Id.* at 445; *see also DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015). And we review any relevant gaps or uncertainties left by the videos, like all other reasonable inferences, in the light most favorable to the plaintiff. *Raimey*, 77 F.4th at 447.

A.

The circumstances leading to Alfatlawy's arrest began when Charles and Smith interviewed Hameed Muhsen, who reported being robbed and stabbed. Following Muhsen's treatment and release from hospital, Charles and Smith interviewed him at his home. Given Muhsen's limited English, the interview was conducted with the assistance of a Dearborn police officer, Mohamed Farhat, serving as an Arabic interpreter.

With Farhat translating contemporaneously, Muhsen explained that his first encounter with his assailants occurred on Rockdale Avenue in Dearborn Heights the night before the assault. As Muhsen was delivering pizzas, he said a man spit on him. Having photographed the man's license plate, Muhsen showed the officers a photo of a Toyota Camry with the vanity plate: "HUSSAIN."

The morning after the altercation on Rockdale, Muhsen said he returned home and was in his driveway when the same car pulled up. Four or five people stepped out—three Arab men and

two Black men—and assaulted him. Via Farhat's translation, Muhsen described being struck on the back of the head and losing consciousness. When he awoke, two of the men were dragging him. One of the Arab men held a gun. The men warned Muhsen not to return to Rockdale, stabbed him on his back and arm, and stole $168 and a bottle of prescription painkillers from Muhsen's car. While he could not describe his assailants beyond their race, gender, and ethnicity as he was "face down on the ground," Muhsen said he could recognize them if he saw them again. Farhat Body Camera, Ex. A, Dkt. 22, 0:07:31–0:07:50; 10:10:00-0:10:11.

Smith noted that Muhsen had a previous address listed on Rockdale and Farhat responded that Muhsen used to live there. Charles asked whether he knew his assailants from when he lived on Rockdale, but Farhat translated that Muhsen had "never seen that car before." *Id.* at 0:11:15–0:11:18. He said the location of the car around the time of the first altercation, however, was one house across from Muhsen's former address. And Muhsen believed that at least the driver of that car "belonged" to that house. *Id.* at 0:14:19–0:14:20.

Throughout the interview, the officers repeatedly attempted to clarify Muhsen's story and identified gaps. Muhsen had waited most of the day to go to the hospital, which confused them. Charles told Farhat that they "[had] to know what the guy look[ed] like who was driving that car" but that Muhsen "[didn't] have that." *Id.* at 0:13:35–0:13:42. And when Smith stepped out during the interview to call a sergeant, he remarked on the lack of clarity, noting the "broken English— like very broken." Smith Body Camera, Ex. B, Dkt. 22, 0:08:36–0:08:38.

Based on the information provided by Muhsen, Charles and Smith searched the Rockdale area where Muhsen allegedly first encountered his assailants and found the Camry with the "HUSSAIN" license plate parked where Muhsen reported he saw it. The car was registered to Alfatlawy at the address at which it was parked.

Accompanied by other officers for support, Smith knocked on the door of the house and announced himself as Detroit Police. When Alfatlawy answered the door after a few minutes, Smith ordered him outside and immediately handcuffed him. As Smith placed Alfatlawy in a police cruiser, Charles spoke with a woman in the house, who identified herself as Alfatlawy's wife. When Charles asked about Alfatlawy's whereabouts at the time of the assault, his wife told her that Alfatlawy worked as a truck driver and was on the road to Ohio that morning.

Following Alfatlawy's arrest, a Detroit police detective took Muhsen's statement and arranged for a photo lineup. Muhsen failed to identify Alfatlawy. The Wayne County prosecutor subsequently declined to file charges based on inadequate evidence and Alfatlawy was released.

B.

Alfatlawy sued under § 1983, asserting that Charles and Smith arrested him without probable cause and used excessive force. Alfatlawy brought additional claims under state tort law against Charles, Smith, and the City of Detroit. All defendants moved for summary judgment. The district court denied Charles and Smith's motion for summary judgment as to the unlawful arrest claim but granted summary judgment as to Alfatlawy's remaining § 1983 claims against all defendants. The district court also dismissed Alfatlawy's claims against the City of Detroit and his claims under state law.

In deciding that Charles and Smith were not entitled to qualified immunity as to Alfatlawy's § 1983 unlawful arrest claim, the district court concluded the existence of probable cause was a "question of fact for a jury and not for the Court on summary judgment" because a jury could reasonably conclude that Alfatlawy's arrest was unsupported by probable cause. Op. and Order, R. 28, PageID 349. Asserting that they did have probable cause and are entitled to qualified immunity, Charles and Smith appeal.

II.

Charles and Smith bring an interlocutory appeal from the denial of summary judgment, challenging the district court's denial of qualified immunity. We must first determine whether this challenge falls within our "narrow" jurisdiction to hear interlocutory appeals. *See Adams v. Blount Cnty.*, 946 F.3d 940, 948 (6th Cir. 2020). We find that it does not, so our analysis begins and ends with our limited jurisdiction. *See Anderson-Santos v. Kent Cnty.*, 94 F.4th 550, 553 (6th Cir. 2024).

A district court's denial of a claim of qualified immunity is an appealable final decision "only to the extent that the appeal turns on an issue of law." *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (internal citations omitted). Where a denial of qualified immunity turns on evidentiary issues, such as whether the "pretrial record sets forth a 'genuine' issue of fact for trial[,]" we lack jurisdiction. *See Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). While we can ignore a defendant's occasional attempt to dispute the facts, *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005), we cannot do so where the factual issues are crucial to the appeal, *Adams*, 946 F.3d at 951 (internal citations omitted). Accordingly, this court has repeatedly refused to assert jurisdiction at the summary judgment stage where the legal arguments rely primarily on a defendant's own disputed version of the facts. *See, e.g., Barry v. O'Grady*, 895 F.3d 440, 445 (6th Cir. 2018); *Perez v. Simpson*, 83 F.4th 1029, 1031 (6th Cir. 2023); *Ramsey v. Rivard*, 110 F.4th 860, 867–68 (6th Cir. 2024).

There are, however, two narrow circumstances where we entertain fact-based interlocutory appeals. *Ramsey,* 110 F.4th at 866 (citing *Adams,* 954 F.3d at 948). First, we may consider appeals where defendants are "willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Barry,* 895 F.3d at 443 (internal citations omitted). Second, we may

consider challenges to the district court's factual determinations or the plaintiff's allegations insofar as those are "blatantly contradicted by the record." *Thompson v. City of Lebanon*, 831 F.3d 366, 370 (6th Cir. 2016) (internal citation omitted); *see also Bunkley*, 902 F.3d at 559. For example, we have jurisdiction where there is "clear" and "indisputable" video evidence that "blatantly contradict[s]" or "utterly discredit[s]" the plaintiff's allegations to make them "implausible." *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (internal citation omitted).

A.

Charles and Smith dispute the district court's assessment of the facts underlying their probable cause determination. A warrantless arrest is reasonable under the Fourth Amendment where there is probable cause to believe that the suspect committed a criminal offense. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). We assess the reasonableness of officers' probable cause determination based on the information the arresting officers had at the time they made the arrest. *See Harris v. City of Saginaw*, 62 F.4th 1028, 1033 (6th Cir. 2023).

In reviewing the record in the light most favorable to Alfatlawy, the district court determined that, at the time of Alfatlawy's arrest, Charles and Smith "knew only that Alfatlawy, an Arab[] male, owned the car Muhsen identified as the one used by his attackers." Op. and Order, R. 28, PageID 348; *see also* Appellee Br., 16. The district court further determined that "[t]o the extent that Muhsen's allegation was an accusation against Alfatlawy, with nothing suggesting that Alfatlawy was driving or an occupant of his car the time of the attack, the accusation was unreliable and uncorroborated." Op. and Order, R. 28, PageID 349; *see also* Appellee Br. 20.

By contrast, Charles and Smith contend that Muhsen's statement indicated that "[t]he same person who spit on him and who drove the vehicle was the same person who stabbed him" and that the person was Muhsen's former neighbor. Appellant Br. 23. And since, as a former neighbor, Muhsen could identify Alfatlawy's address, they assert that the district court erred in determining that Muhsen's accusation was uncorroborated. Charles and Smith's factual account implies that Muhsen knew Alfatlawy and could identify him—as compared to Muhsen merely being able to identify and direct officers to the car allegedly used in his assault.

Contrary to Charles and Smith's description of the facts as undisputed, the inconsistencies reveal several crucial facts in dispute: whether Muhsen identified the attacker as his neighbor, whether Muhsen knew the suspect's address because he knew the *suspect* and not just the location of the car, and whether Muhsen knew and identified his neighbor as the same man who spit on him, drove the car, and stabbed him. These are all facts upon which the officers' probable cause determination purportedly rested. And since the "existence of probable cause in a § 1983 action presents a jury question[] unless there is only one reasonable determination possible," *Brown v. Knapp*, 75 F.4th 638, 647 (6th Cir. 2023), the facts that were "knowable" to Charles and Smith are crucial to this appeal. *Perez*, 83 F.4th at 1031. As such, this is not a factual dispute we may ignore. *Carter*, 408 F.3d at 310.

B.

Given the existence of a crucial factual dispute, we next determine whether this challenge falls within the two narrow circumstances where we entertain fact-based interlocutory appeals. As discussed above, Charles and Smith do not sufficiently concede Alfatlawy's version of events. To invoke appellate jurisdiction, Charles and Smith are required "not only to accept the undisputed facts, but to 'conced[e] the plaintiff[']s] version of the facts.'" *Ramsey*, 110 F.4th at 866 (quoting

*Anderson-Santos*, 94 F.4th at 554). Here, Charles and Smith continue to rest their probable cause arguments on their own version of the facts. Thus, they do not make a sufficient concession, placing this appeal outside the first narrow category of appeals. *See, e.g.*, *White v. Hamilton Cnty.*, No. 23-5384, 2024 WL 1257508, at *2 (6th Cir. Mar. 25, 2024).

With respect to the second narrow category of cases—cases that examine the district court's factual determinations—Charles and Smith mount a direct challenge to the district court's characterization of Muhsen's statement as "unreliable and uncorroborated" and offer a different accounting of what the officers gathered from their interview with Muhsen. We may exercise jurisdiction in these circumstances only where the district court's factual determinations are "blatantly contradicted by the record." *Thompson,* 831 F.3d at 370 (internal citation omitted).

The body camera footage makes it possible to examine the district court's assessment. Since the interview with Muhsen primarily undergirds the officers' probable cause argument, that footage is most material here. In both recordings, the conversation is difficult to discern with overlapping voices and contemporaneous translation. We can discern, however, that the available footage does not blatantly contradict or utterly discredit the district court's findings.

At no point in the footage does Muhsen clearly communicate that "[t]he same person who spit on him and who drove the vehicle was the same person who stabbed him." Appellant Br. 23. Charles specifically asked whether the assailant was the same man who spat on Muhsen previously. Farhat Body Camera, Ex. A, Dkt. 22, 7:59–8:05. According to Muhsen, "it was the same people in the same car." *Id.* But Muhsen does not specifically identify the man who stabbed him as the man who spat on him, nor does he articulate that he knew the suspect personally or that the suspect was his neighbor.

In their respective depositions, Charles and Smith themselves confirm the body camera footage lacks that key information. Charles stated that "the only part that [Muhsen] knew was that he was stabbed by the suspect that we arrested." Charles Dep., Ex. B, R. 21-3, PageID 113. When asked why that could not be heard in Smith's body camera footage, Charles explains, "It wouldn't be on Smith's bodycam because he walked out. He wasn't there for the interview." *Id.* When asked whether her body camera footage was available for "that portion of the interview," Charles replies, "I guess not." *Id.* Notably, Muhsen's alleged statement identifying Alfatlawy as the person who stabbed him also cannot be discerned from Farhat's body camera footage, including during the time that Smith exited the room to call the sergeant.

Meanwhile, Smith explains that he based probable cause on "the fact that the victim was stabbed, the victim gave directions to the address, he took a picture of the license plate, and as I – well, reported in my Report, that *he knew the offender*." Smith Dep., Ex. C, R. 21-4, PageID 142 (emphasis added). He concedes though that the statement that Muhsen "knew the offender" could not be heard in his body camera footage, explaining, "Everything couldn't be discerned on the video or distinguished on the video clearly. I couldn't make out everything on the video." *Id.*

Since Muhsen supplied the car's location across from his former address and reported that the men from that same car later attacked him, a jury may find a reasonable officer would have inferred that to mean that Muhsen believed one of his assailants to be a former neighbor and, consequently, that Muhsen knew the attacker personally. At this stage, however, inferences are made in Alfatlawy's favor. Moreover, a jury may put greater weight on Muhsen's statement that he had "never seen that car before" and his inability to provide any description of Alfatlawy. Farhat Body Camera, Ex. A, Dkt. 2, 0:11:17-0:11:18; 0:10:00-0:10:11.

As such, factual questions underlying Charles and Smith's probable cause determination "preclude our ability to exercise jurisdiction." *Harmon v. Hamilton Cnty.*, 675 F. App'x 532, 543 (6th Cir. 2017). And to the extent that Charles and Smith's arguments with respect to the existence of probable cause turn on their own disputed accounting of what they knew, we lack jurisdiction over those arguments. Moreover, that no one can discern from the footage the facts necessary to support Charles and Smith's account only fortifies the district court's conclusion that, under these circumstances, the existence of probable cause is a question for the jury. *See, e.g.*, *Perez*, 83 F.4th at 1031 ("[I]n this appeal, the facts are everything. So we lack jurisdiction.").

## III.

For the foregoing reasons, we dismiss for lack of appellate jurisdiction.